# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* G POOL, JR., Minor.

UNPUBLISHED
July 12, 2018

Nos. 341964; 341966
Wayne Circuit Court
Family Division
LC No. 16-523205-NA

Before: BORRELLO, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

In Docket No. 341964, respondent-mother appeals by right the order terminating respondents' parental rights to their minor child, GP, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood that child will be harmed if returned to parent). In Docket No. 341966, respondent-father appeals by right the same order. Respondents' appeals were consolidated by order of this Court.[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In August 2016, respondent-mother gave birth prematurely to GP at 25 weeks' gestation; GP tested positive for cocaine at birth and had medical issues requiring surgical treatment. On August 10, 2016, the Department of Health and Human Services (petitioner) petitioned the trial court for protective custody of GP. Petitioner alleged that both respondents had a history of drug use, that respondent-mother had used drugs during her pregnancy, and that there was domestic violence in the relationship. Petitioner also alleged that respondent-mother had an unaddressed bipolar disorder and that respondents were homeless and living out of a semi-truck that respondent-father drove for work. The trial court authorized the petition and removed GP from respondents' care; GP was placed in nonrelative foster care upon his release from the hospital.

On August 25, 2016, the trial court held a pretrial hearing at which respondent-mother admitted that both she and GP had tested positive for cocaine at GP's birth, that respondent-father had provided her with cocaine during her pregnancy, that she and respondent-father were

---

[1] *In re G Pool Jr Minor*, unpublished order of the Court of Appeals, issued January 31, 2018 (Docket Nos. 341964; 341966).

-1-

"involved in a domestic violence relationship," that she had "a bipolar condition," and that she was homeless at the time petitioner filed the petition. Based on respondent-mother's testimony, the trial court took jurisdiction over GP with regard to her parental rights. Respondent-father was not present at the pretrial hearing.

The trial court held a dispositional hearing on September 20, 2016. Both respondents were present. Respondent-father was not ready to proceed to an adjudication trial, as his counsel had just been appointed that day. The trial court ordered that respondent-mother be provided with several services, including parenting classes; substance abuse assessment and treatment; psychological and psychiatric evaluations, if recommended; individual domestic violence counseling; and infant mental health services. The trial court also ordered that respondent-mother comply with random drug tests and that she obtain housing and a legal source of income.

The trial court held an adjudication bench trial for respondent-father on October 20, 2016. Respondent-father admitted to having a criminal history, that he had "assisted" in procuring "illegal substances" for respondent-mother while she was pregnant, and that he took "illegal substances" himself. He admitted that he and respondent-mother were involved in a domestic violence relationship, but claimed that he was the victim. Respondent-father denied that he was homeless but admitted that he and respondent-mother had been "living in and out of [his] truck." The trial court took jurisdiction over GP with regard to respondent-father's parental rights, and ordered similar services and requirements as previously ordered for respondent-mother.

Throughout the next year, respondents periodically complied with portions of their treatment plans, but continued to have issues with substance abuse, missing drug screens, stable housing and employment. On October 6, 2017, after a series of hearings addressing respondents' compliance with their treatment plans, petitioner filed a supplemental petition requesting that the permanency plan be changed from reunification to adoption. The trial court authorized the petition on October 10, 2017.

The trial court held a termination hearing on November 20, 2017. During the pendency of the case, respondent-mother had re-married but had not provided petitioner with any information about her husband. Respondents' caseworker, Jeremy Smith, testified that respondent-mother had begun parenting classes, but had not completed them. Respondent-father had completed a parenting class at an inpatient substance abuse treatment center, but Smith testified that the class "did not meet [petitioner's] standards." Respondent-mother had participated in "several" substance abuse programs but had not completed any. Respondent-mother was in therapy and was making "some progress." Respondent-father never began the ordered therapy. Neither party completed domestic violence counseling or the infant mental health services to which they were referred.

Smith testified that at the time of the hearing neither respondent had obtained suitable housing. Smith had been to respondent-mother's home on October 5, 2017, and he testified that respondent-mother "has a house. She lives with her husband. But when I went out there, there was a hole in the front window. The home was not baby proofed. There was a dissembled crib in the kitchen and the mattress was located in the basement." Smith had requested that respondent-mother's husband be present during the October 2017 home assessment, but he was

not. Respondent-mother did testify that the window was subsequently fixed. As to respondent-father, Smith testified, "The father reported that he is living in a house that was left to him by his grandmother that requires thousands of dollars [sic] worth of work. He refused to allow me to come out to the house to evaluate it."

Both respondents had a history of missed drug screens. Respondent-mother had been ordered to complete 49 drug screens of which she completed only 18 scheduled drug screens and seven unscheduled drug screens. Two of the drug screens tested positive for cocaine. Respondent-mother's most recent positive drug test had been in early September 2017. Respondent-father had been ordered to complete 19 drug screens, of which he completed only five. Smith had explained to both respondents that a missed drug test would be construed as a positive test.

Both respondents exercised some, but not all, of their parenting time. Respondent-mother had been offered 105 visitations, with the opportunity for two visits per week. She opted to have one visit per week and attended only 27 of the 105 scheduled visits, missing three visits in September. Respondent-mother testified that she missed visits because of "[t]ransportation issues." Although she had been offered bus passes, she "wasn't able to get out there to get them." Smith described respondent-mother as "timid, unsure of how to act with baby [GP]." Respondent-mother had only recently begun buying necessary baby supplies, such as diapers and clothing.

Smith testified that respondent-mother's behavior was not always "appropriate" during supervised visits. Smith further testified, "When the birth father was attending visits with her, they would get into arguments in front of the child. They would leave and come back." Smith also testified, "There were visits where we suspected she may have been under the influence but she refused to [drug] screen [sic] at those visits."

Smith testified that respondent-father had also been offered 105 visits but attended only 18. Respondent-father had been incarcerated or in an inpatient substance abuse center for some of the offered visitations. Smith testified that respondent-father would "sometimes get angry" at visits and that he "once raised his voice." Smith also testified that during one supervised visit, respondent-father "appeared very angry and raised his voice and stepped up to me while I was trying to talk to him about appropriate behavior." When asked what Smith meant by "stepped up to me," he explained, "I mean, he physically approached me in an angry manner." Smith testified that he felt "a little threatened." Smith did not believe respondent-father demonstrated appropriate parenting techniques. Respondent-father had also struggled to provide supplies for GP.

Respondent-mother had a legal source of income as a waitress at the time of the hearing. Respondent-father reported that he had lost his job because he had left the state; regardless, he had never provided a verification of income because he reported that "he was being paid under the table." Smith testified that he did not believe that respondents were able to care for GP adequately, especially given his special medical needs. Respondents had attended few medical appointments and had not attended a surgery to correct GP's breathing issues. Respondent-mother testified that she did not attend the surgery because she did not have a ride.

Respondent-father had completed a psychiatric evaluation, but not a psychological evaluation. Respondent-father did not follow the recommendations resulting from the evaluation, including that he take psychotropic medication and participate in outpatient mental health services. Psychological and psychiatric evaluations were also recommended for respondent-mother; she completed a psychological evaluation, but not a psychiatric evaluation. Respondent-mother's evaluation recommended "therapeutic services," and she was participating in those services at the time of the hearing.

Respondent-father had absconded from probation by going to Texas despite the fact that the terms of his probation prohibited him from leaving the state. He claimed that he went to Texas for a family emergency but neglected to inform Smith of his departure. Respondent-father testified that he was not participating in any services at the time of the hearing.

GP had been placed in nonrelative foster care shortly after his birth and was bonded to his foster parents. Respondent-father was not consistent in his contact with the foster care organization. However, respondent-mother was in consistent contact, and she spoke with Smith several times each week. Smith testified that the foster parents were "willing to plan long term" and that they were willing to adopt GP. Smith also believed that the placement was "suitable" and that the foster parents were able to meet all of GP's needs. Smith recommended termination of both respondents' parental rights. Smith stated, "In my experience the child isn't bonded to either of the parents, they have not participated enough, nor have they completed their treatment plans." Respondents both testified and expressed a desire to continue working on their treatment plans.

After hearing oral argument, the trial court found that statutory grounds existed for termination of respondents' parental rights and that termination was in GP's best interests. The trial court terminated both respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). The trial court noted that respondent-father was often unreachable by petitioner and that respondent-mother's participation in GP's life was inconsistent despite being offered bus passes or other methods of transportation. The trial court also noted that respondent-mother's compliance with her treatment plan was sporadic. As to respondent-father, the trial court found that he "ha[d not] done, really, anything." The trial court further noted respondent-father's absence from the state. Regarding GP's best interests, the trial court found that respondents were not in a position to meet GP's needs and that he was in a home where he was "thriving."

These appeals followed.

## II. STANDARD OF REVIEW

"This Court reviews for clear error the trial court's ruling that a statutory ground for termination has been established and its ruling that termination is in the [child's] best interests." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). A trial court's findings are clearly erroneous when "this Court is left with a definite and firm conviction that a mistake has been made." *Id*.

Before a trial court can terminate parental rights, "[a] petitioner must establish by clear and convincing evidence at least one statutory ground for termination of parental rights."

*Hudson*, 294 Mich App at 264. Once a trial court finds that the petitioner has established a statutory ground for termination, the trial court must find by "a preponderance of the evidence on the whole record that termination is in the [child's] best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

This Court reviews for clear error whether "reasonable efforts were made to preserve and reunify the family." See *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). However, we review for "plain error affecting substantial rights" an unpreserved issue regarding reasonable efforts. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. at 9.

### III. STATUTORY GROUNDS FOR TERMINATION

Respondents[2] argue that the trial court erred by finding that statutory grounds for termination were established by clear and convincing evidence under MCL 712A.19b(3)(c)(*i*), (g), and (j). We disagree.

### A. MCL 712A.19b(3)(c)(*i*)

The trial court did not err by terminating respondents' parental rights under MCL 712A.19b(3)(c)(*i*), because the conditions that led to respondents' adjudications continued to exist and there was no reasonable likelihood that either respondent could rectify them within a reasonable time considering GP's age.

Parental rights are terminated under MCL 712A.19b(3)(c)(*i*) when:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

"This statutory ground exists when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services . . . ." *White*, 303 Mich App at 710 (quotation marks and citation omitted).

---

[2] Respondent-father does not challenge the trial court's findings of fact that supported statutory grounds for termination, but only argues that petitioner did not make reasonable efforts at reunification and thus did not prove statutory grounds for termination by clear and convincing evidence, as discussed *infra*.

In this case, the conditions that led to the adjudication were drug use by both respondents, including drug use by respondent-mother during pregnancy; domestic violence in the relationship; homelessness; and respondent-mother's unaddressed bipolar disorder. Neither party made significant progress in their treatment plans. Respondents missed dozens of drug screens, despite being aware that any missed tests would be construed as positive tests. Neither respondent had successfully completed substance abuse therapy, domestic violence counseling, or infant mental health services. Respondent-mother had not completed a psychiatric evaluation, and respondent-father had not completed a psychological evaluation. Respondent-mother had a legal source of income, but respondent-father did not. Additionally, neither party had obtained suitable housing.

Both respondents expressed a desire to continue to work towards compliance with their treatment plans. This Court recognizes that issues such as substance abuse and sobriety can be ongoing and may never truly be "rectified" in the sense of being eliminated as a source of concern. However, the record in this case shows that respondents had many opportunities to comply with their treatment plans, but failed to participate in many offered services or complete those services, and failed to show that they had benefited from the services in which they did participate. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Accordingly, the trial court did not clearly err when it terminated respondents' parental rights pursuant to MCL 712A.19b(3)(c)(*i*).

## B. MCL 712A.19b(3)(g) AND MCL 712A.19b(3)(j)

Further, although only one statutory ground need be proven, *Hudson*, 294 Mich App at 264, the trial court did not err by terminating respondents' parental rights under MCL 712A.19b(3)(g) and (j).

Parental rights may be terminated under MCL 712A.19b(3)(g) when:

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[3]

---

[3] MCL 712A.19b(3)(g) has been substantively amended, effective June 12, 2018. See 2018 PA 58. Under the version of the statute in effect at the time of these proceedings, termination is appropriate if "[t]he parent, *without regard to intent*, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." MCL 712A.19b(3)(g) (emphasis added). Under the new version of the statute, termination is appropriate if "[t]he parent, *although, in the court's discretion, financially able to do so*, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." MCL 712A.19b(3)(g) as amended by 2018 PA 58 (emphasis added).

Parental rights may be terminated under MCL 712A.19b(j) when:

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

"A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *White*, 303 Mich App at 710.

"A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody. . . . Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *White*, 303 Mich App at 710.

Despite being given numerous opportunities, respondents failed to participate in many of the offered services or fully comply with and benefit from their treatment plans. Neither respondent was consistent in attending scheduled visits with GP. Respondent-mother excused her inconsistency by arguing that she had "transportation issues," despite the fact that she had been offered gas cards and bus passes. When respondents attended parenting time, they sometimes engaged in inappropriate behaviors. Respondents argued in front of GP and sometimes left the room. Respondent-mother sometimes appeared to be "under the influence" during visits, and refused drug testing during those times. Neither respondent consistently provided necessary supplies for GP. Respondents failed to attend many of GP's doctor's appointments despite the fact that he had special medical issues. Additionally, neither respondent attended GP's surgery to correct his breathing issues.

Neither respondent completed domestic violence counseling. Respondent-mother did not complete an ordered psychiatric evaluation; respondent-father did not complete an ordered psychological evaluation. Respondent-father additionally refused to follow the recommendations of his psychiatric evaluation. Neither respondent was consistent in cooperating with random drug screens. Neither respondent had adequate housing. Respondent-father was in Texas at the time of the termination trial, despite the fact that the terms of his probation forbade him from leaving the state, and he was no longer participating in any services. Respondent-father was incarcerated from September 21, 2016 until February 12, 2017; however, the termination trial did not take place until November 20, 2017, giving him ample time to comply, or begin to comply, with his treatment plan. The trial court could properly conclude from the evidence that respondents had failed to comply with, participate in, and benefit from their treatment plans. *White*, 303 Mich App at 710. Accordingly, the trial court did not err by terminating respondents' parental rights under MCL 712A.19b(3)(g) and MCL 712A.19b(3)(j).

## C. REASONABLE EFFORTS

Respondent-father argues that petitioner did not undertake reasonable efforts to reunite him with GP. We disagree. In order to preserve an objection regarding the reasonableness of reunification efforts, a respondent must "object or indicate that the services provided to [him or her] were somehow inadequate . . . ." *Frey*, 297 Mich App at 247. "The time for asserting the need for accommodation in services is when the court adopts a service plan . . . ." *Id.* (quotation

marks and citation omitted).[4] Respondent-father did not dispute the availability of services to him until the termination hearing. Accordingly, this issue is unpreserved and reviewed for plain error. *Utrera*, 281 Mich App at 8.

In cases involving the termination of parental rights, the state "must make reasonable efforts . . . to prevent a child's removal from his home and to make it possible for the child to safely return to his home." *In re Rood*, 483 Mich 73, 104; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.). "The state must ensure that appropriate services are provided," and "a court is not required to terminate parental rights if the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home." *Id.* (quotation marks and citations omitted). Additionally, the state must give parents "time to make changes and the opportunity to take advantage of a variety of services . . . ." See *In re Powers Minors*, 244 Mich App 111, 119; 624 NW2d 427 (2000).

"While [petitioner] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *Frey*, 297 Mich App at 248. The trial court is not obligated "to await the mere possibility of a radical change" in a parent's life. See *In re Williams*, 286 Mich App 253, 273; 779 NW2d 286 (2009).

In this case, respondent-father argues that "DHHS made little effort and provided few services" to him and that he "was not given sufficient time to benefit from services." It is true that respondent-father was incarcerated from September 21, 2016 until February 12, 2017. However, the termination trial did not take place until November 20, 2017, giving respondent-father time to come into compliance with the treatment plan, or to at least begin complying with the treatment plan. Instead, the record indicates that while respondent-father was provided referrals to parenting classes, individual therapy, domestic violence counseling, infant mental health, and a psychological evaluation, he completed none of those services. Respondent-father completed a psychiatric evaluation but did not follow its recommendations. Respondent-father had not provided proof of suitable housing or income, had not consistently attended visits, had not consistently cooperated with mandatory drug screens, and had not stayed in consistent contact with his foster care worker. At the time of the termination trial, respondent-father had absconded from probation, was out of state, and was not participating in any services at all.

---

[4] But see *In re Hicks/Brown*, 500 Mich 79, 88-89 & nn 7-9; 893 NW2d 637 (2017) (noting that the Michigan Supreme Court was "skeptical of [the Court of Appeals'] categorical rule" that objections to a service plan are untimely unless raised at or near the time a service plan is adopted). *Hicks/Brown* involved the issue of compliance with the Americans with Disabilities Act (ADA) and other concerns not implicated in this case. Further, respondent-father was often unreachable by petitioner, who was thus denied a chance to discuss the issue of the reasonableness of its efforts at reunification. Finally, respondent-father waited to raise this issue until literally the last day on which he possessed parental rights. Under these circumstances, we are comfortable characterizing respondent-father's issue as unpreserved.

Under these circumstances, it is difficult to see how the offer of any additional services, even if they were available, would have affected the outcome of the proceedings against respondent-father. *Utrera*, 281 Mich App at 8.

Accordingly, the trial court did not err by finding that petitioner made reasonable efforts to reunify GP with respondent-father.

## IV. BEST-INTEREST DETERMINATION

Respondents also argue that it was not in GP's best interests to terminate their parental rights. We disagree.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). In determining whether termination of parental rights is in a child's best interests, the trial court "should consider a wide variety of factors," including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *White*, 303 Mich App at 713 (quotation marks and citation omitted). Additionally, the trial court can consider "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the [child's] well-being while in care, and the possibility of adoption." *Id*. at 714.

Respondent-father has abandoned this issue on appeal by failing to support his argument or to identify any evidence that indicates that termination was not in the best interests of the child. *Hodge v Parks*, 303 Mich App 552, 557 & n 1; 844 NW2d 189 (2014) ("A party cannot simply announce a position and expect the court to search for authority to sustain or reject that position."); *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002) ("Generally, where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court.") (quotation marks and citation omitted). Moreover, the evidence amply supports the conclusion that termination of respondent-father's parental rights was in GP's best interests. There was no evidence of a bond between GP and respondent-father. Respondent-father had not provided proof of suitable housing or income, had not consistently attended visits, had not consistently cooperated with mandatory drug screens, and had not stayed in consistent contact with his foster care worker. At the time of the termination hearing, respondent-father had absconded from probation, was out-of-state, and was not participating in any services.

Respondent-mother argues that termination was not in GP's best interests because she was bonded to him and was in compliance with her treatment plan. Smith testified that respondent-mother was not bonded with GP. Smith also testified about respondent-mother's inconsistency in visitation and noncompliance with random drug testing. Additionally, although respondent-mother was attending parenting classes and individual therapy and had made "some progress," respondent-mother failed to complete domestic violence counseling and substance abuse treatment; further, throughout the history of the proceedings she had a pattern of partial compliance followed by backsliding into noncompliance. Respondent-mother had "not attended

very many" of GP's medical appointments and did not attend his surgery. At times during visits, respondent-mother's behavior was not "appropriate." Additionally, GP's foster parents were "willing to plan long term" and willing to adopt, and were able to meet all of his special needs. Even if a bond existed between GP and respondent-mother, the trial court did not clearly err by determining that other factors, such as GP's need for permanency and stability, respondent-mother's inability to parent GP considering his special needs, and the advantages of a foster home over respondent-mother's, outweighed this bond. *White*, 303 Mich App at 713.

In sum, the trial court did not clearly err by finding that statutory grounds for termination of respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j) were proven by clear and convincing evidence and that petitioner's efforts toward reunification were reasonable. The trial court also did not clearly err by finding that termination of respondents' parental rights was in GP's best interests and therefore entering an order terminating respondents' parental rights.

Affirmed.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Mark T. Boonstra

-10-